AO 106 (Rev. 04/10) Application for a Search Warrant                                             AUSA Geraghty

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )  Case No. 2:23-mj-408
One Black Schok Cell Phone bearing IMEI # )
356183950439707 and SN: 0311104220001367, and )
further identified as ATF Property Item #000044 )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See attachment A to the Affidavit in Support of the Search Warrant Application, incorporated herein by reference.

located in the ___Southern___ District of ___Ohio___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B to the Affidavit in Support of the Search Warrant Application, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| (1) 18 U.S.C. §§ 922(g)(1) & 924(a)(8); and | (1) Possession of a Firearm by a Convicted Felon; and |
| (2) 21 U.S.C. § 841(a)(1) | (2) Possession w/ Intent to Distribute a Controlled Substance (Methamphetamine) |

The application is based on these facts:

See Affidavit in Support of this Application, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Shane Messner, Special Agent, ATF
*Printed name and title*

Sworn to before me and signed in my presence.

Date: July 6, 2023

Kimberly A. Jolson
United States Magistrate Judge

City and state: Columbus, Ohio

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ONE BLACK SCHOK CELL PHONE BEARING IMEI NUMBER 356183950439707 AND SERIAL NUMBER 0311104220001367 | CASE NO. 2:23-mj-408 |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Shane Messner, a Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), being first duly sworn, hereby depose and state the following:

### I. INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a warrant under Rule 41 of the Federal Rules of Criminal Procedure to search one black Schok cell phone bearing IMEI Number 356183950439707 and Serial Number 0311104220001367 ("the **TARGET DEVICE**"), as further described in Attachment A, and to seize items described in Attachment B.

2. I am a Special Agent with the ATF and have been so employed since November of 2005. I am a graduate of the ATF National Academy Special Agent Basic Training and the Federal Law Enforcement Training Center Criminal Investigator Training Program. I am presently assigned as a Special Agent for the ATF Columbus Field Division, Columbus Field Office. Under 18 U.S.C. § 3051, I am empowered to enforce the criminal laws of the United States. As a Special Agent, I have participated in multiple investigations involving federal firearms violations, narcotics trafficking, explosives, and other violent crimes. Through these investigations, I have employed various investigative techniques, including conducting electronic surveillance, using undercover agents and/or confidential informants, and making controlled purchases of firearms, narcotics, and explosives. I have also participated in conducting physical surveillance and have

executed multiple federal arrest warrants. I also know how to analyze information resulting from traditional record searches and reviewing case files. As a result of my training and experience, I am familiar with federal laws pertaining to firearms, narcotics trafficking, explosives, and other violent crimes.

3. I have personally participated in the investigation set forth below. I am familiar with the facts and circumstances of the investigation through my personal participation; from discussions with other ATF agents and law enforcement officers; and from my review of records and reports relating to the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another special agent, law enforcement officer, or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken to or whose reports I have read and reviewed. Throughout this affidavit, reference to "investigators" specifically refers to criminal investigators.

4. This affidavit is intended to show that there is sufficient probable cause for the above-described search warrant and does not purport to set forth all my knowledge of, or investigation into, this matter. The facts and information contained in this affidavit are based on my personal knowledge, my training and experience, my interviews of various witnesses, including law enforcement personnel who participated in this investigation, and my review of certain records and documents.

## II. BACKGROUND ON CONTROLLED SUBSTANCES TRAFFICKING

5. Federal law generally prohibits the manufacture, distribution, and dispensation of controlled substances—including methamphetamine—and the possession with intent to do any of those activities. *See* 21 U.S.C. § 841(a)(1). Federal law also prohibits conspiring to do any of the above. *See* 21 U.S.C. § 846.

6. I know based on my training, knowledge, and experience that individuals who unlawfully distribute controlled substances ("drug traffickers") commonly maintain their tools of the trade—including controlled substances, contraband, proceeds of drug sales, and records and documents related to their drug trafficking—within secure locations inside their residence and/or vehicles both for their ready access and to conceal them from law enforcement.

7. More specifically, I know that drug traffickers commonly maintain both the source of their illicit gains (the controlled substances themselves) and the proceeds of their crimes, in the form of U.S. currency, on-hand to readily maintain and finance their illicit drug business.

8. I also know that drug traffickers commonly maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. Likewise, I know that drug traffickers commonly maintain these books, records, receipts, notes, ledgers, etc., where they will have ready access to them, such as in their cell phones.

9. I also know that drug traffickers commonly maintain addresses or telephone numbers in books, papers, or on electronic media, including on their cell phones or other portable electronic devices, which reflect the names, addresses, and/or telephone numbers of their associates and clients.

10. I also know that drug traffickers often utilize electronic equipment such as cell phones and other portable electronic devices, computers, currency counting machines, and telephone answering machines to generate, transfer, count, record, and/or store information concerning their drug trafficking.

11. I also know that drug traffickers often take or cause to be taken photographs and videos of them, their associates, their property, and their product. Drug traffickers usually

3

maintain these photographs and videos in their possession, commonly on their cell phones or other portable electronic devices.

### III. BACKGROUND ON ILLEGAL FIREAM POSSESSION

12. Federal law generally prohibits individuals who have been convicted of a crime punishable by imprisonment for a term exceeding one year from possessing a firearm or ammunition. *See* 18 U.S.C. §§ 922(g)(1) and 924(a)(8).

13. I know that individuals who possess firearms and ammunition frequently utilize cell phones to take photographs and videos of themselves in possession of their firearms and ammunition. These same individuals also utilize cell phones, to include calls, texts, and social media applications, to arrange the purchase and sale of firearms, ammunition, and/or firearm-related accessories.

14. I also know from my training and experience that "cell phones and the services they provide are 'such a pervasive and insistent part of daily life' that carrying one is indispensable to participation in modern society." *Carpenter v. United States*, 138 S. Ct. 2206, 2220 (2018) (quoting *Riley v. California*, 573 U.S. 373, 385 (2014)).

### IV. PROBABLE CAUSE

15. Based on the facts set forth in this affidavit, there is probable cause to believe that Jamal Frazier has committed violations of 18 U.S.C. § 922(g)(1) (being a felon in possession of a firearm); and 21 U.S.C. § 841(a)(1) (possession with intent to distribute a controlled substance, namely methamphetamine) [collectively, the "**SUBJECT OFFENSES**"]. Furthermore, there is probable cause to search the **TARGET DEVICE** for evidence of those crimes and property designed for use, intended for use, or used in committing those crimes.

16. Between March 30, 2023, and May 24, 2023, an ATF Special Agent working in an undercover capacity (hereinafter referred to as "UC-1") engaged Frazier, who is a convicted felon[1], in a series of undercover purchases of firearms and/or methamphetamine. Each of these controlled purchases occurred at a pre-determined location in Columbus, Ohio, in the Southern Judicial District of Ohio, and each of these purchases was recorded by video and audio devices. During that timeframe, Frazier met with UC-1 on six (6) different dates, to include on two (2) separate dates Frazier met with UC-1 twice in the same day, and Frazier sold UC-1 a total of six (6) firearms including two (2) Glock pistols with attached machinegun conversion devices (also commonly known as "Glock switches") and assorted ammunition. Additionally, Frazier sold UC-1 a total of approximately 1,417 grams (total weight including packaging) of methamphetamine which amounts to approximately 3.12 pounds. During this timeframe, UC-1 frequently communicated with Frazier via cell phone regarding the sale and purchase of firearms and/or narcotics.

## A. NEXUS BETWEEN FRAZIER AND THE TARGET DEVICE

17. On June 8, 2023, ATF investigators executed a federal arrest warrant, in Case No. 2:23-mj-350, at a pre-determined location in Columbus, Ohio, and arrested Frazier.

18. After Frazier's arrest, investigators subsequently executed a federal search warrant on the vehicle that Frazier had arrived in and further identified as a gray 2007 Chevrolet SUV bearing Ohio license plate number JOF-7219 and Vehicle Identification Number ("VIN") 1GNFK13017J112114. Frazier's vehicle search warrant in Case No. 2:23-mj-352 was executed in the basement of the ATF Columbus Field Office located at 230 West Street, Suite 300, Columbus, Ohio. Investigators recovered the **TARGET DEVICE** from inside the vehicle and

---

[1] I have queried the Franklin County Clerk of Courts' Website and learned that Frazier was convicted of two (2) felony offenses to include for Trafficking in Fentanyl Related Compound (F1) in Case No. 20-CR-4389, and for Carrying a Concealed Weapon (F4) in Case No. 11-CR-3936.

5

the **TARGET DEVICE** was found sitting on top of the center console next to the front driver's seat where Frazier had been sitting when he arrived to the pre-determined location. The **TARGET DEVICE** was found to be powered on.

19. The **TARGET DEVICE** was taken into custody at that time and has been in law enforcement custody since Frazier's arrest and the subsequent search of Frazier's vehicle. ATF has continued investigating Frazier and others, known and unknown, who are involved in illegal firearms and/or narcotics trafficking pursuant to the evidence recovered from the federal arrest warrant at the pre-determined location.

20. The **TARGET DEVICE** is currently in storage at 230 West Street, Suite 300, Columbus, Ohio. In my training and experience, I know that the **TARGET DEVICE** has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the **TARGET DEVICE** first came into the possession of the ATF.

## B. SUMMARY OF THE CONTROLLED PURCHASES OF FIREARMS AND/OR NARCOTICS FROM FRAZIER

21. On March 30, 2023, UC-1 conducted a UC operation and purchased two (2) firearms from Frazier at a pre-determined location in Columbus, Ohio. In summary, UC-1 purchased a Taurus, .357 Magnum caliber revolver, bearing serial number Z180352; a Springfield Armory, Model Hellcat, 9mm caliber pistol, bearing serial number BA743081; and ammunition for $1,200.00 in pre-recorded ATF "buy" money from Frazier.

22. On April 11, 2023, UC-1 conducted a UC operation and purchased approximately 57.76 grams (total weight including packaging) of methamphetamine from Frazier at a pre-determined location in Columbus, Ohio. During the operation, Frazier said, "*I sell to my people*

*in bulk…but I got my people I sell little stuff too, but I ain't got no trap so I sell it on the road…"* UC-1 provided Frazier with $350.00 in pre-recorded ATF "buy" money for the narcotics. The narcotics that were purchased were later tested by the Drug Enforcement Administration ("DEA"), and was identified as Methamphetamine Hydrochloride, with a net weight of 55.7 grams +/- 0.2 grams, having a substance purity of 96% +/- 6%, resulting in an amount of pure substance of 53.4 grams +/- 3.4 grams. Dimethyl Sulfone was also identified in the exhibit.

23. On April 20, 2023, UC-1 conducted a UC operation and purchased approximately 460 grams (total weight including packaging) of methamphetamine from Frazier at a pre-determined location in Columbus, Ohio. In summary, UC-1 provided $2,900.00 in ATF "buy" money to Frazier for the narcotics. The narcotics that were purchased were later tested by the DEA, and was identified as Methamphetamine Hydrochloride, with a net weight of 447.9 grams +/- 0.2 grams, having a substance purity of 95% +/- 6%, resulting in an amount of pure substance of 425.5 grams +/- 26.8 grams. Dimethyl Sulfone was also identified in the composite.

24. Later that same day, on April 20, 2023, UC-1 conducted a UC operation and purchased a firearm from Frazier at the same pre-determined location in Columbus, Ohio. In summary, Frazier returned to the location and UC-1 subsequently purchased a DPMS (Panther Arms), Model A-15, .300 caliber blackout pistol, bearing serial number FFH238253, for $1,650.00 in ATF "buy" money from Frazier.

25. On May 10, 2023, UC-1 conducted a UC operation and purchased approximately 445 grams (total weight including packaging) of methamphetamine from Frazier at a pre-determined location in Columbus, Ohio. In summary, UC-1 provided $3,000.00 in ATF "buy" money to Frazier for the narcotics. The narcotics that were purchased were later tested by the DEA, and was identified as Methamphetamine Hydrochloride, with a net weight of 440.0 grams

7

+/- 0.2 grams, having a substance purity of 97% +/- 6%, resulting in an amount of pure substance of 426.8 grams +/- 26.5 grams.

26. On May 18, 2023, UC-1 conducted a UC operation and purchased a firearm (a machinegun) from Frazier at a pre-determined location in Columbus, Ohio. In summary, UC-1 purchased a Glock, Model 19, 9mm caliber pistol, bearing serial number BTPA739, with an attached machinegun conversion device, along with an extended magazine containing 17 live rounds, for $1,800.00 in ATF "buy" money from Frazier.

27. Later that same day, on May 18, 2023, UC-1 conducted a UC operation and purchased a firearm from Frazier at the same pre-determined location in Columbus, Ohio. UC-1 also met with and purchased a different firearm from Michiah Burton and purported Percocet pills from another individual, Dandre Armstrong, who both arrived with Frazier in his vehicle. In summary, Frazier returned to the location with Burton and Armstrong. UC-1 purchased a rifle from Burton and 14.5 purported Percocet pills from Armstrong. Additionally, UC-1 purchased a Glock, Model 19C, 9mm caliber pistol, with a defaced serial number, for $840.00 in ATF "buy" money from Frazier. The purported Percocet pills were later tested by the Ohio Bureau of Criminal Investigation ("BCI") and were determined to contain Oxycodone.

28. On May 24, 2023, UC-1 conducted a UC operation and purchased a firearm (machinegun) and approximately 455 grams (total weight including packaging) of methamphetamine from Frazier at a pre-determined location in Columbus, Ohio. In summary, UC-1 purchased a Glock, Model 19Gen5, 9mm caliber pistol, bearing serial number BTPN602, with an attached machinegun conversion device, for $1,850.00 in ATF "buy" money, along with the narcotics for $3,000.00 in ATF "buy" money from Frazier, for a total amount of $4,850.00. The narcotics that were purchased were later tested by the DEA, and was identified as

8

Methamphetamine Hydrochloride, with a net weight of 447.5 grams +/- 0.2 grams, having a substance purity of 99% +/- 6%, resulting in an amount of pure substance of 443.0 grams +/- 27.0 grams.

29. On June 8, 2023, UC-1 conducted a UC operation and met with Frazier at a pre-determined location in Columbus, Ohio. In summary, Frazier possessed and brought three (3) firearms, specifically an Irwindale Arms, Model Skipper, .40 caliber pistol, bearing serial number G00361; a Taurus, Model G2C, 9mm caliber pistol, bearing serial number ABK072460; and a Glock, Model 43X, 9mm caliber pistol, bearing serial number BVWN275; assorted ammunition; and approximately 875 grams (total weight including packaging) of suspected methamphetamine to sell to UC-1. ATF subsequently arrested Frazier pursuant to his federal arrest warrant, and the above-mentioned evidence along with a different cell phone were seized. Additionally, ATF subsequently executed a federal search warrant on the vehicle Frazier arrived in, and the **TARGET DEVICE** was recovered from Frazier's vehicle.

## C. THE TARGET DEVICE'S RELATIONSHIP TO THE ALLEGED CRIMINAL ACTIVITY

30. As detailed above, it is believed that Frazier possibly used the **TARGET DEVICE** to facilitate multiple unlawful sales of controlled substances, namely methamphetamine, and the sale of firearms, including two (2) Glock pistols with attached machinegun conversion devices (machineguns), that he was prohibited from possessing by federal law. As previously stated, UC-1 frequently communicated with Frazier via cell phone regarding the sale and purchase of firearms and/or narcotics.

31. In addition, I know through training and experience that cell phones are commonly used, or have a relationship to, unlawful acts such as those described in this affidavit. For example, I know that cell phones are commonly used to communicate the sale of drugs,

9

firearms, and other unlawful contraband, and that cell phones can be used for other actions Frazier may have taken in furtherance of his criminal activity.

## V. TECHNICAL TERMS

32. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a device that records still and moving images digitally. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage

media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store any digital data, such as word processing documents, even if the device is not designed to access such files. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer

connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDA's also function as wireless communication devices and are used to access the Internet and send and receive email. PDA's usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDA's run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDA's may also include global positioning system ("GPS") technology for determining the location of the device.

g. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static-that is, long-term-IP addresses, while other computers have dynamic-that is, frequently changed-IP addresses.

h. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections

12

between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

33. Based on my training, experience, and research, I know that the **TARGET DEVICE** has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and/or PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## VI. ELECTRONIC DEVICES AND STORAGE

34. As described above and in Attachment B, this application seeks permission to search and seize things that the **TARGET DEVICE** might contain, in whatever form they are stored. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

35. Searching for the evidence described in Attachment B may require a range of data analysis techniques. In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law-enforcement searches for information. These steps may require agents and law enforcement or other analysts

with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachment B, or perusing all stored information briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, ATF intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B.

## VII. CONCLUSION

36. Based on the forgoing, I believe that there is probable cause to issue a search warrant for the **TARGET DEVICE**, more particularly described in Attachment A, and to seize the items described in Attachment B, as those items constitute evidence of the **SUBJECT OFFENSES** or property designed for use, intended for use, or used in committing the **SUBJECT OFFENSES**.

Respectfully submitted,

Shane Messner, Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Sworn to before me and signed in my
presence and/or by reliable electronic means
this _____ day of July 2023.

Kimberly A. Jolson
United States Magistrate Judge

14

## ATTACHMENT A

### Property to Be Searched

The **TARGET DEVICE** is further described as a black Schok cell phone bearing IMEI Number 356183950439707 and Serial Number 0311104220001367. Photographs of the **TARGET DEVICE** are depicted below:

 

## ATTACHMENT B

### Items to Be Seized

1. All records and information on the **TARGET DEVICE** described in the Affidavit in support of this warrant Application that constitute evidence of a violation(s) of 18 U.S.C. 922(g)(1) and 21 U.S.C. 841(a)(1), involving Jamal Frazier, as well as other known and/or unknown co-conspirators since March 30, 2023, to present, including the following:

    a. Lists of contacts and related identifying information;

    b. Photographs;

    c. Internet history;

    d. GPS data;

    e. Text messages or messages stored in other messaging platforms;

    f. Data stored on the **TARGET DEVICE** through social media platforms to include Facebook, Instagram, Snapchat, and other unnamed platforms similar in nature;

    g. Any information related to sources of firearms and/or narcotics (including names, addresses, phone numbers, or any other identifying information);

    h. Any information related to the trafficking of firearms and/or narcotics (including names, addresses, phone numbers, or any other identifying information);

    i. All bank records, checks, credit card bills, account information, and other financial records; and

    j. Stored electronic mail messages.

2. Evidence of user attribution showing who used or owned the **TARGET DEVICE** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

3. Records evidencing the use of the Internet Protocol address to communicate with unnamed servers, including:

    a. records of Internet Protocol addresses used; and

    b. records of internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

4. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

5. Any other items which constitute evidence of the **SUBJECT OFFENSES** identified above.